IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 14, 2024

**STATE OF TENNESSEE v. VERNICE DARLENE FARRAR**

**Appeal from the Circuit Court for Rutherford County**
**No. 83499A   James A. Turner, Judge**
_____

**No. M2023-01440-CCA-R3-CD**
_____

A Rutherford County jury convicted the defendant, Vernice Darlene Farrar, of three counts of first-degree felony murder, one count of especially aggravated kidnapping, one count of aggravated robbery, one count of aggravated burglary, and three counts of fraudulent use of a debit card, for which she received an effective sentence of life imprisonment plus twenty-five years.  On appeal, the defendant contends the evidence presented at trial was insufficient to support her convictions for first-degree felony murder during the perpetration of a kidnapping, especially aggravated kidnapping, and fraudulent use of a debit card.  She also contends that the trial court erred in affirming her convictions as the thirteenth juror and that her sentence was excessive.  After reviewing the record and considering the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which TOM GREENHOLTZ, and KYLE A. HIXSON, JJ., joined.

Amanda J. Gentry, Nashville, Tennessee, for the appellant, Vernice Darlene Farrar.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and Trevor Lynch, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On June 26, 2019, Robert Owens arrived at the victim's house to mow his yard.  Mr. Owens, who had known the victim, Terry Barber, for fifty years, noticed that the victim's

car and work truck were in the driveway, but the victim's back door was open. This was not unusual as the victim often left the door open for his dogs, and Mr. Owens waited in the yard for several minutes for the victim to come outside and greet him. Eventually, Mr. Owens decided to go into the victim's house to see if the victim was taking a nap. As he walked through the house, Mr. Owens called out for the victim but received no response. Mr. Owens noticed that the converted garage where the victim stored sports memorabilia and collectibles was not typically "that messy," although the victim "wasn't very tidy." When Mr. Owens approached the victim's bedroom, he saw the victim lying face-down on the floor with his hands and feet tied together with bungee cords. Mr. Owens immediately returned to his vehicle and called 911.

Deputy Matthew Arrington with the Rutherford County Sheriff's Department ("RCSD") responded to the 911 call at the victim's house. Upon arriving at the scene, Deputy Arrington observed Mr. Owens standing in the driveway. After waiting for additional patrol units, Deputy Arrington entered the victim's house and located the victim on the floor in a bedroom. Medical personnel soon arrived, and Deputy Arrington assisted in securing the crime scene.

Detective Richard Brinkley with the RCSD assisted in processing the scene, photographing all evidence. In particular, Detective Brinkley photographed the victim's car and truck in the driveway, a suitcase in the victim's bedroom that contained bungee cords, and a Canon camera box.

Detective Dennis Ward with the RCSD obtained the victim's financial records and discovered that several ATM transactions, as well as a CashApp transaction, occurred on the morning following the murder. The victim's debit card was used to withdraw $100 from Fifth Third Bank at 2:09 a.m., $200 from Pinnacle Bank at 2:25 a.m., and $300 from a different Fifth Third bank at 3:29 a.m. Detective Ward obtained photographs from the Pinnacle Bank ATM, which showed a male wearing a "black hoodie with . . . white lettering on the sleeve" using the victim's debit card to withdraw funds. The name associated with the CashApp account used to transfer funds from the victim's account was Kevin Gailey, and a Murfreesboro Police Department officer informed Detective Ward that he had had prior dealings with a Devan Gailey, who appeared to be the same person.

Detective Derrick McCullough with the RCSD canvassed businesses near the Pinnacle Bank and obtained video surveillance footage from the time of the ATM transaction from the Circle K convenience store across the street. Upon reviewing the surveillance video, Detective McCullough observed a small red car pull into the Circle K parking lot. A male matching the description from the ATM photographs exited the vehicle and walked toward the Pinnacle Bank. A few seconds later, the defendant exited the passenger side of the vehicle wearing a University of Alabama jersey. The defendant

entered the Circle K, returned to the vehicle, and reentered the store with the second passenger, who purchased a beverage and lottery tickets. After exiting the store, the driver returned from the direction of the Pinnacle Bank, and they drove away.

Detective Ryan Huggins with the RCSD was tasked with locating Devan Gailey. Upon learning that Mr. Gailey was staying at the Select Inn in Murfreesboro, Detective Huggins set up surveillance on the hotel, and Mr. Gailey was taken into custody during a traffic stop. During a search of Mr. Gailey, officers discovered the victim's wallet; however, the victim's debit card was not inside. Following his arrest, Mr. Gailey provided the names of the defendant and Brent Ross. Detective Huggins matched the defendant's driver's license photograph with images from the surveillance footage from the convenience store. He then located a cell phone number belonging to the defendant and her wife and sent an "exigent ping order" to T-Mobile for emergency tracking of the cell phone. Detective Huggins learned the defendant's cell phone was in Tampa, Florida and gave the local police department a description of the defendant and the defendant's wife's vehicle.

Sergeant Jeff Bartlett with the Tampa Police Department ("TPD") received information regarding a black sedan with a Tennessee license plate that was involved in a homicide investigation and believed to be in Tampa. Sergeant Bartlett located the vehicle and initiated a traffic stop. When Sergeant Bartlett approached the vehicle, he found the defendant driving the vehicle and her wife in the passenger seat. Detective Nicole Sackrider with the TPD performed a search of the defendant and located the victim's debit card inside the defendant's wallet.

Sergeant Bartlett spoke with the defendant's wife, who provided the address of her mother, Katie Childs. Ms. Childs provided consent for Sergeant Bartlett to search her home for Mr. Ross, who had not been located at the time. While in the residence, Sergeant Bartlett observed a football helmet and a University of Tennessee Smokey figurine, as well as collectible cars, duffle bags, coolers, blankets, and other memorabilia with various team logos on them.

After receiving word that the defendant was in custody in Tampa, Detective Huggins obtained a search warrant for the defendant's house. Inside the defendant's residence, Detective Huggins located "memorabilia that matched the description of what [the victim] had in his home," including several hats and a University of Alabama wall clock. In the trash can on the defendant's back porch, Detective Huggins observed twelve business cards from the victim's sports collectible business.

Following the search of the defendant's residence, Detective Huggins and Detective Steve Brown traveled to Tampa and interviewed the defendant. During the interview, the

defendant, who appeared alert but "[a] little bit foggy," admitted to going to the victim's house with Mr. Gailey and Mr. Ross on the night of the murder. However, she stated that she did not go past the converted garage that stored the sports memorabilia and denied participating in the murder.

While in Tampa, Detective Huggins executed a search warrant on the home of the defendant's mother-in-law and located a University of Alabama jersey that matched the one worn by the defendant in the surveillance footage from the convenience store, a University of Tennessee backpack, a Vanderbilt fleece blanket, a University of Tennessee diecast car, and a B.B. gun. Meanwhile, Detective Brown participated in a search of the defendant's wife's vehicle at the TPD impound lot. Inside the vehicle, Detective Brown collected two University of Tennessee hats and a Canon camera lens. After returning to Tennessee, Detective Brown contacted Mr. Owens, who reviewed photographs of the items collected from the residence and vehicle in Tampa and agreed that they were items he had seen in the victim's house.

Dr. Erin Carney, an expert in forensic pathology, performed the autopsy on the victim. Dr. Carney testified that the victim's cause of death was strangulation. Dr. Carney explained that the victim's hyoid bone was broken on the left side and noted petechial hemorrhages in the victim's left eye, redness and congestion in the victim's right eye, congestion of the right sternothyroid muscle, and bruises on the victim's right forearm. Dr. Carney also observed ligature abrasions on the victim's wrists and ankles where the bungee cords had been removed. Dr. Carney testified the victim had a "mildly enlarged heart" and noted evidence of prior heart surgery, including a prosthetic heart valve.

The defendant testified on her own behalf, stating that she began drinking at the age of ten and using drugs at the age of thirteen. The defendant stated that she and her neighbor, Tammy Houston, would often drink and use drugs together while the defendant's wife was at work. One afternoon, the defendant, Ms. Houston, and Mr. Gailey were using drugs at the defendant's house when Ms. Houston stated that she knew how they could make some money. According to Ms. Houston, she had previously worked for the victim, and "[a]ll you had to do was talk to him, and you could take whatever you wanted." Although they did not go to the victim's house that day, the defendant and Ms. Houston went to the victim's house together on two occasions to steal sports collectibles. The first time, the defendant stayed in the car while Ms. Houston and another man stole various items from the victim. However, the second time the defendant went to the victim's house, she "loaded . . . up" Ms. Houston's vehicle with sports collectibles from the converted garage. The defendant stated that she kept most of the stolen goods for herself and agreed that Ms. Houston sold the remaining items for drugs. According to the defendant, the victim was asleep during the second visit, and the defendant did not see him.

On the night of the murder, Mr. Gailey and Mr. Ross came to the defendant's house, and they began drinking and using methamphetamine. Mr. Ross complained that he needed money because someone stole his vehicle, and Mr. Gailey suggested that they go to the victim's house and steal items to sell for money. The defendant testified that she agreed to go with them but only wanted to take University of Alabama items for personal use. Mr. Gailey drove them to the victim's house, and they entered through the converted garage. While the defendant testified she remained in the garage with the sports collectibles, Mr. Gailey and Mr. Ross continued through the house. The defendant heard the victim beg Mr. Gailey and Mr. Ross not to hurt him, but she did not go to the victim's bedroom to check on him. Once they returned to Mr. Gailey's vehicle, the defendant became aware that the men were in possession of the victim's wallet and phone. She asked them if the victim was okay, and they confirmed that he was unharmed. The group then drove to the Circle K where Mr. Gailey walked to a nearby ATM to withdraw money, and the defendant and Mr. Ross purchased alcohol and cigarettes. Afterward, they went to another bank to withdraw money, before Mr. Gailey dropped the defendant off at her house. The defendant told them that she "wanted some more" drugs, so Mr. Gailey and Mr. Ross purchased methamphetamine with the money they had withdrawn from the victim's account and returned to the defendant's house, where the three of them used the methamphetamine together.

The defendant denied ever using the victim's debit card and stated she did not know the victim's PIN number until "[a]fter the fact." The defendant testified she did not know that Mr. Gailey and Mr. Ross planned to hurt the victim, and if she had known, she "would have never got in that car." Although she acknowledged Mr. Ross brought her realistic-looking B.B. gun that night, the defendant stated that she let him borrow it several weeks prior to the murder. The defendant testified she wore a mask on the night of the murder because she recently met the victim when her cousin attempted to buy the victim's work truck, and she did not want him to recognize her. She denied stealing all of the items confiscated by police, claiming that she purchased several of the items on her own and that others were from the second time she went to the victim's house with Ms. Houston. The defendant acknowledged having prior convictions for robbery, driving under the influence, and theft.

On cross-examination, the defendant stated that, although she was honest during her interview with detectives, "[her] words got twisted a lot" because she was on detox medication at the time of the interview. The defendant did not recall telling detectives that she asked Mr. Gailey and Mr. Ross "how are you going to keep the man from calling the police from the time that you get the bank card until you get to the bank" or that they responded that they were going to tie up the victim and take his cell phone. The defendant also did not recall telling detectives that she "heard [Mr. Gailey] talking to [the victim], and [Mr. Gailey] saying we don't want to hurt you, just give me the card and the number.

[The victim] repeated the number. Then he said, don't hurt me." The defendant denied stating in her interview that the victim "kept saying don't hurt me," testifying that the victim "only said that one time."

The jury convicted the defendant of three counts of first-degree felony murder (counts one, two, and three), one count of especially aggravated kidnapping (count four), one count of aggravated robbery (count five), one count of aggravated burglary (count six), and three counts of fraudulent use of a debit card (counts seven, eight, and nine). Following a bifurcated hearing, the jury imposed a sentence of life imprisonment for the first-degree felony murder convictions. The trial court subsequently imposed sentences of twenty-five years at 100% for count four, twelve years at 100% for count five, ten years at 35% for count six, and eleven months, twenty-nine days for counts seven, eight, and nine. The trial court merged counts two and three into count one and ordered counts four, five, six, seven, eight, and nine to be served concurrently with each other but consecutive to count one, for an effective sentence of life imprisonment plus twenty-five years.

The defendant filed a motion for new trial which the trial court denied. This timely appeal followed.

*Analysis*

On appeal, the defendant argues the evidence presented at trial was insufficient to support her convictions for first-degree felony murder during the perpetration of a kidnapping, especially aggravated kidnapping, and fraudulent use of a debit card.[1] The defendant also contends the trial court erred in affirming her convictions as the thirteenth juror and in imposing an excessive sentence. The State contends that the evidence is sufficient and the trial court fulfilled its duty as thirteenth juror and properly sentenced the defendant.

## I.    Sufficiency[2]

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury

---

[1] The defendant does not challenge her convictions for first-degree felony murder during the perpetration of a robbery, first-degree felony murder during the perpetration of a burglary, aggravated robbery, and aggravated burglary.

[2] For the sake of clarity, we have reordered and renumbered the issues from the order they appeared in the defendant's brief.

shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the following rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

At trial, the State relied on a theory of criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id.* § 39-11-402(2). Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999).

The defendant need not physically participate in the crime in order to be criminally responsible. *Phillips v. State*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). "Presence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred." *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). "No particular act need be shown. It is not necessary for one to take physical part in the crime[;] [m]ere

- 7 -

encouragement of the principal is sufficient." *Id.* The defendant must "knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime." *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

## A.    Especially Aggravated Kidnapping and First-Degree Felony Murder

The jury convicted the defendant of the first-degree felony murder and especially aggravated kidnapping of the victim. As relevant to this appeal, first-degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping." Tenn. Code Ann. § 39-13-202(a)(2). Especially aggravated kidnapping occurs when one "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty" and "the victim suffers serious bodily injury." Tenn. Code Ann. §§ 39-13-302 (a); -305 (a)(4). "'Serious bodily injury' means bodily injury that involves: (A) a substantial risk of death; (B) protracted unconsciousness; (C) extreme physical pain; (D) protracted or obvious disfigurement; (E) protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" *Id.* § 39-11-106(a)(37).

In the light most favorable to the State, the evidence shows the defendant and Ms. Houston went to the victim's house on two occasions to steal sports collectibles that were later exchanged for drugs. On the night of the victim's murder, the defendant, Mr. Gailey, and Mr. Ross were drinking alcohol and using drugs when Mr. Ross indicated that he needed money. Mr. Gailey, who was present when Ms. Houston told the defendant about the victim's house, suggested that they steal some of the victim's sports collectibles. The defendant, Mr. Gailey, and Mr. Ross drove to the victim's house and entered through the converted garage where the collectibles were stored. Before entering the house, the defendant asked Mr. Gailey and Mr. Ross "how [they were] going to keep [the victim] from calling the police from the time that [they got] the bank card until [they got] to the bank," and they responded that they were going to tie the victim up and steal his phone. The three of them were wearing masks, and Mr. Ross carried the defendant's realistic-looking B.B. gun. While the defendant remained in the converted garage and decided which of the victim's items to steal, Mr. Gailey and Mr. Ross proceeded through the house toward the victim's bedroom. The defendant heard Mr. Gailey tell the victim that he "[did not] want to hurt [him], just give me the card and the number." The victim gave them the requested information and repeatedly said, "don't hurt me." However, the defendant did not attempt to check on the victim during this time, instead choosing to make multiple trips to Mr. Gailey's vehicle with bags full of stolen sports memorabilia. Mr. Gailey and Mr. Ross then tied the victim's hands and feet together with bungee cords and strangled him to death. After leaving the victim's house, the defendant, Mr. Gailey, and Mr. Ross stopped at multiple ATMs to withdraw money from the victim's bank account, which was later used to purchase methamphetamine that they used together. During a search of her house,

her wife's vehicle, and her mother-in-law's house, detectives found numerous items that were identified as belonging to the victim. From this evidence, a rational jury could find beyond a reasonable doubt that the defendant intended to commit or to promote or assist in the commission of the especially aggravated kidnapping of the victim or to benefit in the proceeds or results of the kidnapping and that the victim was killed during the kidnapping.

The defendant argues that she was unaware of Mr. Gailey and Mr. Ross's actions toward the victim, and therefore, "[i]t would have been impossible for her to knowingly confine [the victim]." However, as we noted above, the defendant need not physically participate in the crime in order to be criminally responsible. *Phillips*, 76 S.W.3d at 9. Through its finding of guilt, the jury rejected her argument and accredited the State's witnesses and theory of guilt based upon the defendant's criminal responsibility for the conduct of another. We will not disturb that finding on appeal. *State v. Bland*, 958 S.W.2d 659, 659 (Tenn. 1997). The defendant is not entitled to relief on this issue.

## B.     Fraudulent Use of a Debit Card

The defendant was convicted of three counts of fraudulent use of a debit card under $1,000. "A person commits the crime of fraudulent use of a credit or debit card who uses, or allows to be used, a credit or debit card or information from that card, for the purpose of obtaining property, credit, services or anything else of value with knowledge that . . . [t]he card is forged or stolen." Tenn. Code Ann. § 39-14-118(b)(1).

In the light most favorable to the State, the evidence at trial showed, while the defendant was in the victim's house stealing sports collectibles, her accomplices murdered the victim and stole his debit card. The defendant, Mr. Gailey, and Mr. Ross then drove to three ATMs, and Mr. Gailey withdrew amounts of $100, $200, and $300. Mr. Gailey and Mr. Ross purchased methamphetamine with this money and brought the drugs back to the defendant's house, where the three of them used the methamphetamine together. At the time of her arrest, the victim's debit card was in the defendant's wallet, and the defendant testified that she knew the victim's PIN number. During her interview with detectives, the defendant admitted that Mr. Gailey and Mr. Ross told her that they were going to take the victim's debit card prior to arriving at the victim's house, and when the defendant asked how they were going to stop the victim from alerting the police, they stated that they were going to tie the victim up and take his cell phone. The evidence is, therefore, sufficient to support the defendant's fraudulent use of a debit card convictions under a theory of criminal responsibility, and the defendant is not entitled to relief on this issue.

## II.     Thirteenth Juror

The defendant argues that the trial court erred in affirming her convictions as the thirteenth juror and that the weight of the evidence does not support her convictions. The State responds that the trial court properly acted as thirteenth juror.

Tennessee Rule of Criminal Procedure 33(d) provides that "a trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This procedural rule has been described as "the modern equivalent to the 'thirteenth juror rule,' whereby the trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict." *State v. Blanton*, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). The rationale behind the thirteenth juror rule is that "[i]mmediately after the trial, the trial court judge is in the same position as the jury to evaluate the credibility of witnesses and assess the weight of the evidence, based upon the live trial proceedings." *State v. Moats*, 906 S.W.2d 431, 434 (Tenn. 1995). Rule 33(d) "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). "[W]hen the trial judge simply overrules a motion for new trial, an appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict." *Id.* Once the trial court fulfills its duty as the thirteenth juror and imposes a judgment, appellate review is limited to determining the sufficiency of the evidence. *Moats*, 906 S.W.2d at 435 (citing *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)).

At the conclusion of the defendant's trial, the trial court stated that "[t]he findings of the jury as to the guilt of the [d]efendant are the order of the [c]ourt acting as the 13th juror." During the motion for new trial hearing, the trial court addressed the defendant's argument that it erred in affirming the defendant's conviction as thirteenth juror, finding "that even if the [c]ourt did not place the lens of viewing the evidence in a light most favorable to the State, the [c]ourt would find that the evidence was not only sufficient, but overwhelming to support the convictions." Because the trial court fulfilled its duty as the thirteenth juror, our review is limited to the sufficiency of the evidence. *Moats*, 906 S.W.2d at 435. As previously discussed, the evidence is sufficient to support the defendant's convictions, and therefore, the defendant is not entitled to relief on this issue.

## III.    Sentencing

The defendant challenges the trial court's decisions regarding the length and manner of service of her sentence. She asserts the trial court misapplied enhancement factor (10). She further argues the trial court erred in imposing partial consecutive sentences. The State contends the trial court properly weighed the enhancement factors and bases for consecutive sentences.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. §§ 40-35-113, -114, -210(b). In addition, the court must consider the defendant's potential for rehabilitation, and "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(4), (5).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, -210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id.* § 40-35-210(e).

When an accused challenges the length and manner of service of a sentence, this Court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

## A. Enhancement Factors

The defendant argues the trial court misapplied enhancement factor (10). Specifically, the defendant contends that, because she "took active steps to mitigate the risk of bodily injury to [the victim] and believed that bodily injury would not occur," there was no proof in the record that she had "no hesitation about committing a crime when the risk to human life was high." The State contends the trial court properly weighed the enhancement factors.

Here, the trial court applied enhancement factors (1) the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (2) the defendant was a leader in the commission of an offense involving two (2) or more criminal actors; (4) a victim of the offense was particularly vulnerable because of age or physical or mental disability; (6) the personal injuries inflicted upon . . . the victim [were] particularly great; (10) the defendant had no hesitation about committing a crime when the risk to human life was high; (12) during the commission of the felony, the defendant intentionally inflicted serious bodily injury upon another person, or the actions of the defendant resulted in the death of, or serious bodily injury to, a victim or a person other than the intended victims; and (13) at the time the felony was committed, one (1) of the following classifications was applicable to the defendant: (C) released on probation. Tenn. Code Ann. § 40-35-114(1), (2), (4), (6), (10), (12), (13)(C). The trial court stated that it did not "place great weight" on factor (4) and found no applicable mitigating factors.

In considering enhancement factor (10), the trial court noted,

> Again, the [c]ourt agrees with the State that when you break into someone's home at night, three people with ski masks and a fake gun, something is bound to go wrong. And it did in this case.

Enhancement factor (10), requiring a finding that the defendant had no hesitation about committing an offense involving a high risk to human life, "is applicable only when there is proof that the defendant's conduct in committing the offense created a high risk to the life of someone other than the victim." *State v. Trent*, 533 S.W.3d 282, 294 (Tenn. 2017). The record does not contain evidence reflecting that the defendant placed anyone other than the victim at risk. Accordingly, the trial court erred in applying this factor.

Moreover, while the trial court applied enhancement factors (6) the personal injuries inflicted upon . . . the victim [were] particularly great and (12) during the commission of the felony, the defendant intentionally inflicted serious bodily injury upon another person, or the actions of the defendant resulted in the death of, or serious bodily injury to, a victim or a person other than the intended victims, it did not specify to which convictions these enhancement factors applied. We note that it is well-settled that statutory enhancement

- 12 -

factors may not be applied if they are essential elements of the offense. *See State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). Our supreme court noted that "proof of serious bodily injury will always constitute proof of particularly great injury." *State v. Jones*, 883 S.W.2d 597, 602 (Tenn. 1994). Accordingly, our Court has held that application of enhancement factor (6) is not appropriate in cases where serious bodily injury was an element of the offense. *See id.* at 602 (aggravated assault); *State v. Nix*, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995) (especially aggravated robbery); *State v. Williamson*, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995) (vehicular assault). Therefore, the trial court erred in applying enhancement factors (6) and (12) to the defendant's convictions for especially aggravated kidnapping and aggravated robbery.

Although the trial court misapplied enhancement factors (6), (10), and (12), there is no evidence in the record to suggest the trial court gave the factors great weight. Additionally, our supreme court has explained that a trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed . . . . So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Bise*, 380 S.W.3d at 706. In this case, enhancement factors (1), (2), (4), and (13) were applicable to each of the defendant's convictions, and enhancement factors (1), (2), (4), (6), (12), and (13) were applicable to the defendant's convictions for aggravated burglary and fraudulent use of a debit card. Our review of the record indicates the trial court imposed a sentence within the applicable range after properly considering the evidence adduced at trial and the sentencing hearing, the presentence report, the principles of sentencing, the parties' arguments, the nature and characteristics of the crime, the potential for rehabilitation, and the evidence of enhancement and mitigating factors. Tenn. Code Ann. §§ 40-35-103(5), -114, -210(b). The defendant is not entitled to relief on this issue.

## B.    Partial Consecutive Sentences

The defendant argues the trial court erred in imposing partial consecutive sentences. Specifically, the defendant contends the trial court erred in finding that she was a dangerous offender and that she had a record of criminal activity that is extensive. However, the defendant concedes that she was on probation at the time of the murder. The State contends the trial court properly weighed the bases for consecutive sentencing.

In *State v. Pollard*, 432 S.W.3d 851 (Tenn. 2013), the Tennessee Supreme Court expanded its holding in *Bise* to also apply to decisions by trial courts regarding consecutive sentencing. *Id.* at 859. This Court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated

- 13 -

section 40-35-115(b)." *Id.* at 861. "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." *Id.* at 862 (citing *State v. Dickson*, 413 S.W.3d 735 (Tenn. 2013)).

A trial court "may order sentences to run consecutively" if it finds the defendant is "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code. Ann. § 40-35-115(b)(4); *see State v. Wilkerson*, 905 S.W.2d 933, 936 (Tenn. 1995). Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939. Our supreme court has stated that the trial court must make specific findings about "particular facts" which show the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

In imposing consecutive sentences, the trial court articulated its reasons, as follows:

[T]he [c]ourt does find that the [d]efendant is an offender whose record of criminal activity is extensive. The [c]ourt finds that the [d]efendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk of human life is high, and that the circumstances surrounding the commission of the offense are aggravated.

Statutorily, they are defined as aggravated. Three of the offenses for which [the defendant] has been convicted have aggravated in the name. But the [c]ourt further finds that they are aggravated.

That confinement for an extended period of time is necessary to protect society from the [d]efendant's unwillingness to lead a productive life, and the [d]efendant's resort to criminal activity in furtherance of an anti-social lifestyle, and that the aggregate length of the sentences reasonably relate to the offense of which the [d]efendant stands convicted.

Further, the [c]ourt finds that the [d]efendant was on probation at the time, which is another factor.

. . . .

- 14 -

[T]he [c]ourt does order consecutive sentencing. All the cases sentenced today would run . . . concurrent with one another, but consecutive to the felony murder convictions.

In determining whether to require the defendant to serve her sentences consecutively, the trial court found the defendant had no hesitation about committing a crime in which the risk to human life was high. *See* Tenn. Code Ann. § 40-35-115(b)(4). As a result, the trial court determined the defendant was a dangerous offender.

The trial court then proceeded to consider the *Wilkerson* factors. Although the trial court stated on the record that an extended sentence was necessary to protect the public from further criminal conduct by the defendant and that the length of the defendant's sentence reasonably related to his offenses, it failed to state the specific facts it found to satisfy its conclusion. *See State v. Calloway*, No. M2004-01118-CCA-R3-CD, 2005 WL 1307800, at *13 (Tenn. Crim. App. June 2, 2005) ("We agree with Defendant's contention that the trial court failed to make the specific factual findings required by *Wilkerson* as a prerequisite to finding that Defendant is a dangerous offender for whom consecutive sentencing is appropriate. The mere recitation of the *Wilkerson* factors is not a substitute for the requirement of making specific findings."); *State v. Craig*, No. E2001-01528-CCA-R3-CD, 2002 WL 1972892, at *9 (Tenn. Crim. App. Aug. 27, 2002) ("A mere statement that confinement is necessary to protect society and that the severity of the sentence is reasonably related to the convicted offenses, without more, is insufficient to justify consecutive sentences [under *Wilkerson*]."); *Wilkerson*, 905 S.W.3d at 938 (holding the trial court must make "*specific findings* regarding the severity of the offenses and the necessity to protect society before ordering consecutive sentencing under Tenn. Code Ann. § 40-35-115(b)(4)") (emphasis added). Because the trial court failed to make specific factual findings supporting factor (4), we cannot sustain its order imposing consecutive sentences on this basis. *Pollard*, 432 S.W.3d at 869 ("[W]hen trial courts fail to include the two additional findings before classifying a defendant as a dangerous offender, they have failed to adequately provide reasons on the record to support the imposition of consecutive sentences.").[3]

The defendant also contends the trial court erred in finding she was an offender whose record of criminal activity is extensive. Tenn. Code Ann. § 40-35-115(b)(2). Our supreme court recently held that a trial court should consider the following non-exclusive factors when finding that a defendant has an extensive record of criminal activity:

---

[3] We typically would remand the case so that appropriate factual findings can be considered and made. *Pollard*, 432 S.W.3d at 864. However, given our holding below that consecutive sentences were properly ordered on other ground, a remand for these purposes is unnecessary.

(1)     The amount of criminal activity, often the number of convictions, both currently before the trial court for sentencing and prior convictions or activity;

(2)     The time span over which the criminal activity occurred;

(3)     The frequency of criminal activity within that time span;

(4)     The geographic span over which the criminal activity occurred;

(5)     The multiplicity of victims of the criminal activity; and

(6)     Any other fact about the defendant or circumstance surrounding the criminal activity or convictions, present or prior, that informs the determination of whether an offender's record of criminal activity was considerable or large in amount, time, space, or scope.

*State v. Perry*, 656 S.W.3d 116, 129 (Tenn. 2022) (footnotes omitted).  Prior convictions or criminal activity "may demonstrate 'a consistent pattern of operating outside the confines of lawful behavior' and provide some stronger measure of justification for finding that a defendant is an offender whose record of criminal activity is extensive." *Id.* at 131 (quoting *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)).

Despite this guidance from our supreme court, in the present case, the trial court simply stated that it "[found] that the [d]efendant is an offender whose record of criminal activity is extensive."  Because the trial court did not articulate any reasoning for its finding on the record, its decision to impose partial consecutive sentences based on Tennessee Code Annotated § 40-35-115(b)(2) is not entitled to deference.  Nevertheless, we note that the record supports a finding that the defendant's record of criminal activity is extensive.  In addition to the nine convictions the defendant received for her role in the murder of the victim, the presentence report shows that the defendant had four felony convictions and ten misdemeanor convictions spanning the defendant's entire adult life as well as multiple states and counties.  The defendant also admitted to using illegal drugs, including marijuana and methamphetamine.  As such, we affirm the trial court's order imposing consecutive sentences based upon the defendant's extensive record of criminal activity.

Notwithstanding the trial court's insufficient findings regarding § 40-35-115(b)(2), (4), the trial court also found that the defendant was being sentenced for an offense committed while on probation, an additional basis for imposing consecutive sentences.  *See* Tenn. Code Ann. § 40-35-115(b)(6); *Pollard*, 423 S.W.3d at 862 ("Any one of these grounds is a sufficient basis for the imposition of consecutive sentencing.") (citing

*Dickson*, 413 S.W.3d at 748).  Accordingly, the trial court did not abuse its discretion by imposing consecutive sentences, and the defendant is not entitled to relief on this issue.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE